Filed 7/26/23  Steshenko v. Foothill-De Anza Community College Dist. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREGORY STESHENKO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, et al.,<br><br>    Defendants and Respondents. | H049871<br>(Santa Clara County<br>Super. Ct. No. 17CV317602) |

Plaintiff Gregory Steshenko was a student in the medical laboratory technician program (MLT program) at De Anza College.  He sued the Foothill-De Anza Community College District (the District) and certain of its employees, alleging that they subjected him to age discrimination that prevented him from securing a required six-month clinical externship.  As a result of the discrimination and in breach of a putative implied contract, he alleged that he was unable to graduate, secure licensing, or obtain employment as a medical laboratory technician, and that he suffered emotional distress from defendants' conduct.

The trial court granted defendants' motion for summary judgment and denied Steshenko's ensuing motion for a new trial.  Finding no error, we affirm.

# I.    BACKGROUND[1]

In the operative complaint, as relevant here, Steshenko alleged causes of action for (1) age discrimination (against the District); (2) breach of contract (against all defendants); and (3) intentional infliction of emotional distress (against the District).[2] Seeking (among other remedies) compensatory and punitive damages as well as specific performance "enabling plaintiff's graduation from the MLT program," he alleged that interviewers at program-affiliated laboratories at Natividad Medical Center (Natividad), Community Hospital of the Monterey Peninsula (CHOMP), and Spectra Laboratories (Spectra) denied him externships on the basis of his age and that defendants—in violation of state law and their contractual duties to him as an enrolled MLT student—authorized or acquiesced in the laboratories' discrimination.

## A.    *Defendants' Motion for Summary Judgment*

In July 2021, defendants filed an amended notice for a motion for summary judgment and, in the alternative, summary adjudication of issues.  Steshenko opposed defendants' motion and filed his own motion for summary judgment or summary adjudication, the denial of which he has not appealed.

The following evidence was before the trial court on defendants' motion:[3]

---

[1] Noting that the Clerk's Transcript is missing relevant documents, defendants filed a request for judicial notice on appeal which includes all of the documents related to the motions for summary judgment.  We deem the request a motion to augment the record and grant the motion.

[2] Other causes of action, disposed of by demurrer prior to the summary judgment litigation, are not at issue in this appeal.

[3] We take the following facts from the parties' separate statements of undisputed facts, evidence admitted in conjunction with defendants' motion for summary judgment, and admissions in the parties' briefs.  (See *Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1186, fn. 4.)

2

The District operates the state-approved MLT program at De Anza College in Santa Clara County. In 2016, Steshenko, a self-described "long-term unemployed [e]lectrical [e]ngineer" over the age of 50, enrolled in the MLT program in the fall quarter of 2016. To graduate from the program,[4] each MLT student must complete a six-month externship comprising four "clinical practicum" courses with "Clinical Affiliates" in Santa Clara and surrounding counties. (See Cal. Code Regs., tit. 17, § 1035.1, subd. (b)(2) [approved MLT training programs must include "at least 26 weeks, consisting of at least 1040 hours, of instruction and practical experience in moderate complexity testing in chemistry . . . ; hematology; microbiology . . . ; and immunology"].) According to the MLT program student handbook, which defendants twice provided to Steshenko, "securing placement in the clinical training portion of De Anza College's MLT program is a competitive process. Students must interview with clinical affiliates for clinical training positions and are not guaranteed placement. If an MLT student interviews for clinical placement and is not chosen by a clinical training facility, the MLT program director will contact the Education Coordinator(s) for feedback on the MLT student. The MLT program director will work with the student to improve or alleviate any concerns brought forth by the clinical sites. The student may be referred to De Anza College's Occupational Technical Institute where interview and resume assistance is available. The student may continue to interview for clinical placement. If within two years of completing the academic portion of the MLT program, the student has been unable to secure clinical training, they will no longer be eligible to compete for placement."

---

[4] Although the program is in theory two years in duration, the first year of the program may be satisfied by general education requirements for De Anza's related Associate of Arts degree in Medical Laboratory Technology. Admission to the MLT program's "[p]rofessional [y]ear" requires a phlebotomy certification.

3

During Steshenko's time as a student, defendant Patricia Buchner was the MLT program director. In connection with the program, the District enters into agreements with local clinical laboratories to provide externship opportunities to students. Buchner informed students in the program that they needed to interview with the clinical affiliates to obtain an externship for the practicum courses.

In May 2017, Steshenko was informed of available externships at CHOMP and Natividad. Early the next month, Steshenko submitted his resume and application materials to both, requesting an interview. Steshenko's resume disclosed, among other qualifications, that he had obtained a postgraduate degree 23 years earlier. The following month, Steshenko was invited to interview with Linda Delcambre, lab educator at Natividad, and Un Sil Lee, supervisor of laboratory services at CHOMP, respectively. After each interview, he was informed that he would not be accepted to placement.

After Steshenko's rejection from CHOMP, Buchner e-mailed CHOMP's laboratory supervisor Un Sil Lee for feedback on Steshenko's interview. Lee responded that the laboratory "had some reservation[s] regarding [Steshenko's] answers. He showed small interest regarding [the] whole laboratory (for example, phlebotomy area: reason we have to have CPT license)[.] Most concerning us was that he emphasized his area of expertise, i.e.[,] electrical engineer; laudatory as the major may be, it will not help us in hospital setting." Buchner informed Steshenko by e-mail of the feedback Lee had provided, specifically the perception that he "lacked enthusiasm/interest in working in all areas of the laboratory." She suggested that he "keep in mind the needs of the clinical site" and "[s]peak to [his] audience." She invited him to participate in interview coaching, but he declined.

Steshenko responded, "[T]hey were looking for a phlebotomist. The only interest they demonstrated was in getting someone who would do phlebotomy for them without . . . pay for 6 month[s]. . . . My statement that pure phlebotomy has never been my career aspiration was the breaker. [¶] . . . I for one am not looking for a phlebotomy

4

externship. [¶] . . . Are you seeking for the sites that would be less interested in exploitation of the phlebotomy skills of your students and more in giving the MLT training?" Steshenko also wrote Buchner that with Natividad as well, "the breaker" was Natividad's expectation that he perform phlebotomy duties without pay.

At the end of June 2017, Steshenko wrote to Buchner that the Natividad and CHOMP interviewers had discriminated against him on the basis of his age. He also complained in an August 2017 e-mail to Buchner that the externships were a "circumvention of labor law through the unpaid employment of the already licensed and experienced phlebotomists under the guise of 'clinical training.' Under that scheme, only the experienced phlebotomists willing to donate their labor to the clinical agencies are afforded an opportunity to graduate from your school. Because of that conspiracy and because of my age, I am precluded from graduation." He added: "I request an immediate assignment to a clinical agency within a commuting distance from my residence, or any form of alternative training that would allow for my timely graduation from your school. Barring that, I would have no choice but to take an action for recovery of damages."

In August 2017, Steshenko filed an administrative complaint alleging age discrimination by the District. Defendant Lorrie Ranck, De Anza's associate vice president of instruction, informed Steshenko that "the College MLT program has no power or authority to force a participating clinical site to accept any particular student for an externship" and that "[o]nce the school selects students who are able to advance to the externship portion (selection of trainees), the decision on whether to accept or reject any of our students for an externship is entirely that of the site." Ranck also informed Steshenko that "[a]llegations of discrimination are taken seriously" and that his complaint had been referred to the Dean of Student Development: "[S]hould you wish to pursue this claim further you will need to communicate with the Dean of Student Development, . . . as she is the campus contact."

5

Also in August 2017, Steshenko submitted his resume and application materials to Crystal Green, human resources manager at Spectra. Steshenko interviewed with Spectra in September and later alleged that the Spectra interviewer said, "Look around, does anyone here look like you?" Steshenko saw the laboratory was staffed only by young people. Later that month, Spectra notified Steshenko that they had accepted another candidate.

Defendants notified Steshenko of further opportunities for clinical placements, but he told Buchner in mid-December 2017 that he would no longer pursue clinical placements because "as a result of your actions, I lost my funding. Hence, I no longer can perform an [*sic*] unpaid full-time work for half a year that you conditioned graduation from your school upon, unless it is funded. . . . [¶] In the meantime, the damages grow with every passing day, and the window for an uncomplicated settlement is closing fast."[5] He also objected that the commute from his home to three of the proposed placements was prohibitive. He later added: "Please, do not contact me unless you have a realistic solution for my graduation from your school. Such a solution could be discussed only before the end of this year, because the next year the damages related to the lost earnings will become extremely prominent and my graduation would not be sufficient to end litigation."

Steshenko did not complete the clinical practicum courses required for graduation from the MLT program.

**B.**    ***Ruling on the Motion for Summary Judgment and Steshenko's Motion for New Trial***

The trial court granted defendants' motion for summary judgment. On the first cause of action, the court found there was no triable issue of material fact as to either age

---

[5] According to Steshenko, the delay in his anticipated graduation date had resulted in the County of Santa Cruz terminating certain job-retraining benefits he had been reliant on.

6

discrimination by the District or the existence of an employment relationship subject to the Fair Employment and Housing Act (FEHA). On the breach of contract cause of action, the court concluded there was neither an implied contract between the parties nor any evidence to support breach of such a contract. On the cause of action for intentional infliction of emotion distress, the court found there was no extreme and outrageous conduct by the District to support the claim.

Steshenko moved for a new trial, which the trial court denied.

Steshenko timely appealed.

## II.    DISCUSSION

### A.    *Defendants' Motion for Summary Judgment*

Where a defendant has prevailed on summary judgment, " ' "we review the record de novo to determine whether [they have] conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." [Citation.]' [Citation.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Genisman v. Carley* (2018) 29 Cal.App.5th 45, 49 [defendant moving for summary judgment bears " 'the burden of showing that . . . one or more elements of the cause of action cannot be established' "].) The moving defendant "bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.) Upon a defendant's prima facie showing of the nonexistence of a triable issue of material fact, the plaintiff "is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

7

1. *Age Discrimination*

In his cause of action for age discrimination, Steshenko alleged that the District's administration of the MLT program's clinical externship requirement violates the Fair Employment and Housing Act (Government Code section 12900, et seq.) (FEHA),[6] section 11135, and Education Code section 66292. All three statutes target discrimination in different ways. FEHA concerns unlawful employment practices, such as discrimination in hiring. (§ 12940; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 603 (*Donovan*).) Section 11135 prohibits discrimination by a program or activity that receives state funding. (§ 11135; see also *Donovan*, *supra*, 167 Cal.App.4th at p. 603.) Education Code section 66292 requires community college districts to ensure equal access to education. In our independent judgment, the District negated at least one element necessary to maintaining a cause of action under each statute.

a. *FEHA*

FEHA makes it an unlawful employment practice for "an employer, because of . . . age . . . to refuse to hire or employ [a] person or to refuse to select [a] person for a training program leading to employment . . . ." (§ 12940, subd. (a).) "FEHA requires 'some connection with an employment relationship,' although the connection 'need not necessarily be direct.' [Citation.] 'If there is no proscribed "employment practice," the FEHA does not apply.' [Citation.]" (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 (*Vernon*); *Talley v. County of Fresno* (2020) 51 Cal.App.5th 1060, 1091; *Shephard v. Loyola Marymount Univ.* (2002) 102 Cal.App.4th 837, 842 (*Shephard*).)[7]

---

[6] Undesignated statutory references are to the Government Code.

[7] With two exceptions not applicable here, FEHA tautologically defines an "employer" as "any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil

8

As we will discuss, we conclude that the District carried its initial burden of negating an essential element of Steshenko's FEHA theory by making a prima facie showing that it neither employed him nor controlled the relationship between the clinical affiliates and MLT students.[8]  The District also met its initial burden of showing that the MLT program is not a "training program leading to employment" within the meaning of section 12940 but an educational prerequisite to examination and licensure, themselves prerequisites to employment as a medical laboratory technician.  (See Bus. & Prof. Code, § 1260.3; see also Cal. Code Regs., tit. 17, § 1030.6 ["[g]raduating from a medical laboratory technician training program" and "pass[ing] a written examination for medical laboratory technicians" allows one "to qualify for licensure as a medical laboratory technician."].)  Steshenko raised no triable issue of material fact in response.

### i.  *Employment relationship*

Although Steshenko alleged generally the existence of an employment relationship between defendants and himself, he pleaded none of the customary hallmarks of an employment relationship—remuneration or control over students' performance of employment duties.  (See *Vernon*, *supra*, 116 Cal.App.4th at pp. 124-126 [considering " 'totality of circumstances' . . . with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties" and particularly "the absence of any direct or indirect remuneration from the defendant to the plaintiff"].)[9]  To the

---

subdivision of the state, and cities . . . ."  (§ 12926, subd. (d).)  "Employee" is defined by exclusion:  " 'employee' does not include any individual employed by that person's parent, spouse, or child or any individual employed under a special license in a nonprofit sheltered workshop or rehabilitation facility."  (§ 12926, subd. (c).)

[8] We express no opinion as to whether the external affiliates could be considered employers.

[9] Relevant factors include "the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and

9

contrary, he noted that participation in the MLT program's clinical component is "unpaid and unregulated" and "unrelated to Program coursework," and that MLT students "work under the supervision of the [clinical affiliates'] laboratory personnel" to whom he asserts the District "unlawfully delegated control" over selection of students.

As a general matter, Steshenko's status as a student does not make him an employee of the District. It is true that "a student may at times be an employee of a school; for instance, when a student works in the school's cafeteria or library for wages in addition to attending classes. Or, . . . a student may be an employee of a third party engaged by the school to provide the student with practical training in addition to the academic instruction offered by the school where the student renders services that are of economic benefit to the third party." (*Land v. Workers' Comp. Appeals Bd.* (2002) 102 Cal.App.4th 491, 496.) Absent such circumstances, however, "[t]he students of a school . . . are not employees, but consumers of its product, education." (*Ibid*.)

Even a student athlete, for example, is not a school employee despite the school's provision of athletic equipment, uniforms, transportation, and scholarships. (See *Shephard*, *supra*, 102 Cal.App.4th at p. 845; see also Lab. Code, § 3352, subd. (a)(11).) The Legislature expressly excluded student athletes from the definition of "employee" in Labor Code section 3352, subdivision (a)(11) to abrogate the holding of *Van Horn v. Industrial Accident Commission* (1963) 219 Cal.App.2d 457, that a student athlete who received scholarship funds could be entitled to workers' compensation benefits. But even in *Van Horn*, the court made clear: "It cannot be said as a matter of law that every student who receives an 'athletic scholarship' and plays on the school athletic team is an

assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment." (*Vernon*, *supra,* 116 Cal.App.4th at p. 125.)

employee of the school. . . . Only where the evidence establishes a contract of employment is such inference reasonably to be drawn." (*Id*. at p. 467.) Absent legislative recognition of student athletes as school employees—despite the provision of scholarships, equipment, travel expenses, etc., for their physical labor on behalf of their school—we are hard pressed to find that a non-athlete student, receiving nothing that could be construed as remuneration, would be considered a school employee.

Even assuming, as Steshenko maintains, the clinical practicum would have him performing uncompensated duties[10] for a clinical affiliate, this would not render him an employee of the District, given the clinical affiliates' unimpeded supervision and control over students' work performance, work schedule, and working conditions.

As Steshenko noted in the operative complaint, "California law recognizes the doctrine of a joint employer relationship." But "[t]here is no magic formula for determining whether an organization is a joint employer. Rather, the court must analyze 'myriad facts surrounding the employment relationship in question.' [Citation.] No one factor is decisive. [Citation.]" (*Vernon*, *supra*, 116 Cal.App.4th at pp. 124-125.) Of the relevant factors, however, " 'the extent of the defendant's right to control the means and manner of the workers' performance is the most important.' " (*Id*. at p. 126.) Steshenko in his complaint makes no allegation that the District exercises any actual control over students' work for the clinical affiliates; to the contrary, he specifically alleged that the District unlawfully ceded control to the clinical affiliates and that it is the "laboratories [that] select [the] students" for externships and that the students "work under the supervision of the laboratory personnel." Steshenko instead relies solely on an allegation that the District "indirectly exercise[s] control over working conditions," in that it is "legally entitled to the direct control at any moment through revocation of [its]

---

[10] A state-approved MLT program must provide its "students" with "practical experience" and "practical training." (Cal. Code Regs., tit. 17, § 1035.1.)

11

delegation" of control to the clinical affiliates. The evidence, however, refutes Steshenko's allegations of any right of control by the District, whether direct, indirect, or through an agency relationship with the clinical affiliates.

To begin, the "Education Agreement" between the District and Natividad, by its plain terms, "shall not be construed to create the relationship of agent, servant, employee, partnership, joint venture or association between the SCHOOL and the CLINICAL FACILITY, but is rather an agreement between independent contractors for the sole purpose of establishing a clinical experience component to the SCHOOL'S Program of instruction."[11] The agreement further provides that the number of students placed at Natividad requires Natividad's agreement, that Natividad may decline to work with any District student, and that a Natividad employee "directly supervises the Student in his/her clinical practicum."

The District's contracts with CHOMP and Spectra likewise demonstrate the District's inability to control the ultimate placement of students with the laboratories.[12] The CHOMP agreement provides that "at any time and for any reason or no reason, [CHOMP] may direct that the trainee(s) be removed from training within the facilities." In a similar vein, the Spectra agreement states that Spectra "shall have the authority to approve or disapprove any and all aspects of the Program as conducted pursuant to this Agreement . . . ." These provisions demonstrate that, even if the District had some ability to select the pool of candidates, or even one specific candidate, to send to the clinical

---

[11] Steshenko attached the Natividad contract to the operative complaint as typifying the District's agreements with clinical affiliates.

[12] At oral argument, the parties agreed to our taking judicial notice of these contracts, given their relevance; there is no factual dispute that the documents—proffered by Steshenko—are genuine and accurate. (Evid. Code, § 452, subd. (h); *Chacon v. Union Pacific Railroad* (2020) 56 Cal.App.5th 565, 572.)

12

affiliates, the affiliates had the final say in selecting students for placement in their facilities.

Moreover, the student handbook, which Steshenko received and acknowledged before interviewing with any clinical affiliate, also made clear that the clinical affiliates ultimately decide which of the MLT students to accept for placement—selection for the externship requirement was "competitive," students needed to "interview with clinical affiliates for clinical training positions and are not guaranteed a position." Buchner herself, on welcoming the students to "the externship stage," warned them: "Be aware that a particular site may want a background check, drug testing, proof of vaccination and/or other information for that particular site. . . . They may require different shift work, for example[,] Livermore does require most of your training [in the] evening, a rare graveyard and some days."

Beyond these characterizations of the relationship between the District and the clinical affiliates, the conduct of the parties further confirms the affiliates' independent control over selection from among the District's admitted MLT students. Upon learning of a clinical placement opportunity, Buchner notified all eligible MLT students of the opening and the laboratory's application process. She specifically counseled Steshenko "that Natividad and CHOMP are looking to 'take' people with the recent 'customer service' experience; therefore [he] must emphasize that experience in [his] resume." She provided remedial assistance to those students who encountered difficulty securing a clinical placement. Buchner attempted to contact each of the laboratories that rejected Steshenko for placement "to solicit feedback . . . regarding his interviews." For example, upon learning that CHOMP was declining to offer Steshenko a placement, she wrote the CHOMP laboratory supervisor, noting CHOMP's "unfortunate" decision and asking about Steshenko's interview "and how he can improve his efforts in the future . . . ." While the program director would work with students to optimize their prospects for placement, the clinics themselves would decide whether to choose a student for an

13

externship and there was a possibility a student might be "unable to secure clinical training."

For his part, Steshenko, on first requesting the District refer him for a clinical placement, acknowledged in writing the clinical affiliates' interview requirement and the associated risk that he might be denied his preferred placement. And upon being informed by the District of available clinical openings, he duly sent his resume and application materials directly to the clinical laboratories—CHOMP, Natividad, and later Spectra—each of which responded by inviting him to interview. He sent a thank-you note to his Natividad interviewers pending news of their decision, which demonstrates acknowledgement of Natividad's control over his selection for the externship.

Notwithstanding Steshenko's objections that these facts are "nonsensical," "immaterial," "irrelevant," "improper and unintelligible," "false and incompetent," or "omit material information," he raises no triable issue of material fact to counter the District's prima facie showing that it had no employment relationship with him, whether directly or via agents it controlled.

### ii.    *Training program leading to employment*

Steshenko alternatively predicates his claim of FEHA liability[13] on the allegation that the District itself discriminated against him by refusing to select him for "a training program leading to employment." (§ 12940, subd. (a).) Steshenko relies on the District's reference to students in the MLT program as "trainees" and defendant Ranck's statement that the *intent* of the MLT program is to prepare students for employment in medical, clinical, research and public health laboratories. This theory is unavailing on the record before us.

---

[13] To the extent Steshenko's first cause of action had included an allegation against the individual defendants under section 12940, subdivision (c), the trial court sustained the individual defendants' demurrer to this cause of action.

14

The District provided evidence that Steshenko was a student in the MLT program, which was accredited by the National Accrediting Agency for Clinical Laboratory Sciences and approved by the Laboratory Field Services unit of the California Department of Health Services, and therefore intended to satisfy the educational requirement for licensure and to prepare students for the written examination likewise required for licensure. (See Bus. & Prof. Code, § 1260.3; see also Cal. Code Regs., tit. 17, § 1030.6, subd. (a)(2)(A).) The student handbook sets forth the program's goals, one of which is to provide students with instruction and training to meet employment needs of "the local health care industry and surrounding communities," not the District itself. Further, the contracts between the District and Natividad, CHOMP, and Spectra, respectively, specifically disclaim any employment relationship between the students and the affiliates, and the Natividad contract expressly disavows any intention to provide any "offer or obligation of permanent employment."

Any vocational or professional education program is "intended" to prepare (or "train") students for employment. To construe "leading to employment" so broadly would render that language superfluous, in violation of the contrary canon of statutory construction. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 658 [" '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage' "]; see *Burks v. Kaiser Foundation Health Plan, Inc*. (2008) 160 Cal.App.4th 1021, 1027.) Here, the contingencies necessary for a student to parlay MLT program completion into eventual employment as a medical laboratory technician are not insignificant.[14] Instead, completion of an approved MLT program is just one requirement for licensure as a medical laboratory technician; successful completion of a written

_____

[14] We have no occasion to address whether an MLT program administered by a licensed clinical laboratory—rather than an accredited college or university that has no medical laboratory of its own—might constitute a "training program leading to employment." (See, e.g., Cal. Code Regs., tit. 17, § 1035.1, subd. (a)(1).)

15

examination is also necessary.  (See Cal. Code Regs., tit. 17, § 1035.1, subd. (a)(3).)
Licensure, in turn, is a requirement to perform the duties of a medical laboratory
technician, including supervision of certified phlebotomy technicians at the level
Steshenko was upon admission to the MLT program.  But licensure does not ensure
employment.[15]

Steshenko raised no triable issue of material fact on this issue, himself asserting
that he had no intention of applying for employment with any clinical affiliate.  To the
extent Steshenko argues that the MLT program's requirement of clinical education
renders it an unlawful apprenticeship (Lab. Code, § 3075 et seq. & Cal. Code Regs., tit. 8,
§ 205 et seq.) or internship (Ed. Code, § 79140 et seq.), he ignores the very specific
regulatory scheme to which training and licensure of medical laboratory technicians are
subject.  (See, e.g., Cal. Code Regs., tit. 17, §§ 1035.1 [referring to MLT program
participants as "students"] & 1030.6.)

### b.  *Section 11135 and Education Code Section 66292*

Although we understand Steshenko's age discrimination cause of action to rely
principally on FEHA, Steshenko in pleading this first cause of action further cited
section 11135 and Education Code section 66292, alleging that on August 10, 2017 he
filed an administrative claim with De Anza College for age discrimination and unlawful
operation of the MLT program, and that the District failed to remedy the discrimination.
Because "De Anza College is a part of California government directly funded by the
state" and is further part of California's public education system, Steshenko appears to
assert that his claim of age discrimination is independently cognizable—against the
District, not the clinical affiliates—under section 11135's prohibition on discrimination

---

[15] As further stated in the student handbook, completion of both the classroom and
clinical components of the MLT program entitles "a student to sit for a national Medical
Laboratory Technician certification examination."

by state-run or state-funded programs and the Equity in Higher Education Act (Ed. Code, § 66250 et seq.) (the Act).

Under these anti-discrimination statutes, the District had the obligation not to act with "deliberate indifference" to any known act of discrimination. (See *Donovan*, *supra*, 167 Cal.App.4th at p. 605.) The evidence in the record is sufficient for the District to meet its initial burden of demonstrating that it did not act with deliberate indifference to Steshenko's complaint of age discrimination. There is evidence that Buchner offered to provide Steshenko with interview coaching, which he rejected, and also continued to present Steshenko with opportunities to interview at additional placement sites, which he also rejected. Further, the evidence shows that in response to Steshenko's complaint, Ranck communicated to Steshenko that his complaint was being taken seriously and that he should follow up with the Dean of Student Development to whom his complaint had been elevated. In addition to these actions taken by the District, we observe that the feedback received regarding Steshenko's interviews, his reluctance to prepare more thoroughly for them, and his complaints about performing phlebotomy tasks as well as unpaid labor in the form of an externship would have given the District reason to temper its response based on the belief that age discrimination might not be the actual cause for Steshenko's inability to get a placement. Taken together, this evidence shifts the burden to Steshenko to raise a triable issue of material fact as to the adequacy of the District's response, which he fails to do.

### i. *Applicable Legal Principles*

Section 11135, subdivision (a) states, in relevant part: "No person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state

17

agency, is funded directly by the state, or receives any financial assistance from the state." Where a state agency "has reasonable cause to believe that a contractor . . . has violated the provisions of Section 11135 . . . , the head of the state agency, or that person's designee, shall notify the contractor . . . of such violation and shall submit a complaint detailing the alleged violations to the Civil Rights Department for investigation and determination" pursuant to section 12960 et seq. (§ 11136.)

As a threshold matter, we reject the District's contention that section 11135 does not apply because the clinical component of the MLT program was not funded by the state. (See *Comunidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116, 1130 [concluding that state funding to a city's local enforcement agency for its waste management programs did not constitute state support to the entire city]; but see *id.* at p. 1136 (dis. opn. of Rubin, J.) [citing legislative mandate to construe section 11135 broadly].) Even under the District's construction of the statute, the District has not met its initial burden of production on this issue: the District's separate statement and other evidence fail to address in any way whether the MLT program's required clinical training receives state funding.

We take note that the gravamen of Steshenko's claim is that the clinical affiliates were "acting on behalf of De Anza College" in their discrimination and that the District continued to require Steshenko's uncompensated employment via the clinical practice component of the MLT program, rather than accept as fact Steshenko's allegations of discrimination and enable him to graduate without the burden of the unpaid clinical practicum work. Although not dispositive, we observe that while the statutory scheme that includes section 11135 creates a private right of action, it does not contemplate an action for damages (see § 11139 [private right of action limited to equitable relief]), nor does it supply authority for Steshenko's position that the District must permit him to graduate without completion of the clinical practice requirements imposed as a matter of state regulation. (See, e.g., *Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 905 [private

18

litigants' relief "would only require the state-level defendants to 'submit a complaint detailing the alleged violations . . . for investigation and determination' "]; see also Cal. Code Regs., tit. 17, § 1035.1, subd. (b)(2) [requiring "at least 26 weeks, consisting of at least 1040 hours, of instruction and practical experience," as well as didactic training and practical training in phlebotomy].)

Like section 11135 et seq. in the state funding context, the Act prohibits invidious discrimination in the educational context and establishes an administrative scheme for enforcement of the prohibition. (Ed. Code, §§ 66290, 66292.3.) Also like section 11135 et seq., the Act establishes an administrative enforcement mechanism: as is pertinent here, the governing board of a community college district has "primary responsibility" for ensuring compliance. (Ed. Code, §§ 66292.) Unlike section 11139, however, the private right of action established by the Act is not limited to equitable relief. (See Ed. Code, § 66292.4; *Donovan*, *supra*, 167 Cal.App.4th at p. 595.)

In *Donovan*, the court analogized the California Education Code's antidiscrimination law to Title IX of the federal Education Amendments of 1972, 20 U.S.C. § 1681 et seq. as interpreted by the United States Supreme Court and rejected plaintiffs' urging to follow FEHA's imposition of liability against an employer for the wrongful acts of a third party based on the doctrine of respondeat superior. (*Donovan*, *supra*, 167 Cal.App.4th at pp. 604-605.) Although *Donovan* addressed sexual orientation harassment under another antidiscrimination provision of the Education Code, section 220 (applicable in general education), we consider its well-reasoned analysis applicable here. For our purposes, Education Code sections 200 et seq. and 66290 et seq. are largely parallel in their structure, their administrative enforcement focus, their language establishing the private right of action, and the legislative declaration of purpose and intended construction. (Compare Ed. Code, § 66251 with *id.*, § 200; compare *id.*, § 66252, subd. (g) with *id.*, § 201, subd. (g); compare *id.*, § 66292.3 with *id.*,

19

§ 220.)  Consistent with *Donovan*, we see no basis to impose liability on the District for the acts of the clinical affiliates on the basis of respondeat superior.

Contrary to the District's contention, however, *Donovan*'s refusal to impose liability on a school for the discriminatory acts of third parties does not end our inquiry. It is well established that the pleadings " 'set the boundaries of the issues to be resolved at summary judgment.' "  (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250; see also *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 (*FPI Development*) [the pleadings serve "as the outer measure of materiality in a summary judgment proceeding"].)

Steshenko's age discrimination cause of action seeks to hold the District liable not only on an agency theory but on the theory that it had "conceived, created and operat[ed] the system that discriminates against the students on the basis of their age in access to their training program, and predicates graduation from the program upon the student's age[,]" if only passively.  We look to whether liability for money damages under the Education Code's antidiscrimination provisions may properly be "based on [a publicly funded school's] *own* misconduct, determined by its *own* deliberate indifference to known acts" of prohibited discrimination.  (*Donovan*, *supra*, 167 Cal.App.4th at p. 605.) As in *Donovan*, we must consider whether the District is liable for misconduct of its own, once on actual notice of Steshenko's claim of discrimination.[16]

The *Donovan* court applied the deliberate indifference standard to Education Code section 220.  (*Donovan*, *supra*, 167 Cal.App.4th at p. 605.)  We have already noted the similarities between that statute and the Education Code provisions at issue here.  We

---

[16] To the extent the trial court granted summary judgment of Steshenko's age discrimination claims in reliance on defendant's state-funding assertions and the absence of an agency relationship between the District and the clinical affiliates, we invited the parties to address in supplemental briefing the application of *Donovan* and the standard of deliberate indifference.  (See Code Civ. Proc., § 437c, subd. (m)(2).)

20

also note that Education Code section 220 is intended to be "interpreted as consistent" with section 11135. (Ed. Code, § 201, subd. (g).) In a similar vein, we observe that the deliberate indifference standard applies to the Rehabilitation Act, and "[s]ection 11135 'is identical to the Rehabilitation Act except that the entity must receive State financial assistance rather than Federal financial assistance.' " (*Bassilios v. City of Torrance, CA* (C.D. Cal. 2015) 166 F.Supp.3d 1061, 1084; *Y.G. v. Riverside Unified School Dist.* (C.D. Cal. 2011) 774 F.Supp.2d 1055, 1065, fn. 6; *D.K. ex rel. G.M. v. Solano County Office of Educ.* (E.D. Cal. 2009) 667 F.Supp.2d 1184, 1190; *T.B. ex rel. Brenneise v. San Diego Unified School Dist.* (9th Cir. 2015) 806 F.3d 451, 466 ["To establish a claim for damages under the Rehabilitation Act and [Americans with Disabilities Act (ADA)], a plaintiff must prove that the defendant intended to discriminate on the basis of his or her disability, or was deliberately indifferent to the disability."]; *Meister v. City of Hawthorne* (C.D. Cal. 2015) 2015 WL 12762058, at *9, 11 [stating that "[b]ecause Title II of the ADA and Section 504 of the Rehabilitation Act are nearly identical, courts have determined that claims brought under the ADA and Rehabilitation Act should be analyzed together and case law interpreting each statute is applicable to both" and also that because section 11135, subdivision (a) "parallel[s] Title II of the ADA and Section 504 of the Rehabilitation Act, the same analysis applies"].) We therefore conclude the deliberate indifference standard applies to both section 11135 and the Act and we address whether the District has met its burden on summary judgment of conclusively negating deliberate indifference.

"[D]eliberate indifference is a ' "very high standard." ' [Citation.] Actions that in hindsight are 'unfortunate' or even 'imprudent' will not suffice. [Citation.]" (*Donovan*, *supra*, 167 Cal.App.4th at p. 610.) In the context of student-on-student harassment, where the school has disciplinary authority over the student wrongdoer, "[t]he deliberate

21

indifference standard ensures that the disciplinary actions of school officials will not be second-guessed by the courts."[17]  (*Id.* at p. 610.)

### ii.    *Absence of "Deliberate Indifference"*

The District's insistence that it did not itself discriminate would not, without more, adequately respond to Steshenko's contention that the District itself engaged in wrongdoing by not merely tolerating the clinical affiliates' alleged discrimination but enabling it to cause him the injury of not timely graduating.  But neither section 11135 et seq. nor the Act obligates the District to relieve students of established educational requirements, particularly where doing so would jeopardize the MLT program's eligibility to train MLT students for certification under California Code of Regulations, title 17, section 1035.1, which mandates the practical training and its content and minimum hours, including minimum required phlebotomy labor.  We do not construe the " ' "very high standard" ' " of deliberate indifference (*Donovan*, *supra*, 167 Cal.App.4th at p. 610) to be satisfied by the District's mere acceptance of the limits of its contractual authority, on the one hand, and the demands of state approval, on the other.

On this record, the District has shown it did not ignore Steshenko's discrimination complaint.  Ranck told him his complaint had been elevated to the Dean of Student Development and instructed him to contact that dean as the District representative responsible for these issues.  Buchner gave him tactical advice for tailoring his presentation to the clinical sites and offered him interview coaching, while continuing to forward notices of clinical placements as they emerged, in spite of his mounting exasperation.  We recognize that these measures do not substantively redress alleged discrimination at its source, and we express no opinion on the factual merits of Steshenko's allegations of age discrimination by CHOMP, Natividad, and Spectra,

---

[17] In another context, it has been noted that "[m]ere negligence is insufficient to meet this standard which describes a state of mind more blameworthy." (*Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 287.)

because our focus here is not on third-party conduct but the existence or not of a triable issue of material fact as to whether the District was deliberately indifferent to the allegations of age discrimination. And through that lens, we are obliged to consider the constraints—contractual and regulatory—on the District's options.

That the District did not accede to Steshenko's demands—in July 2017 for "alternative training," in August 2017 for "an immediate assignment to a clinical agency within a commuting distance from my residence," and in September 2017 for immediate resolution of his discrimination complaint—does not reflect deliberate indifference here. The record establishes that the District—unlike the school principal and, by extension, the school district in *Donovan*—lacked the means to unilaterally override a clinical affiliate's refusal of an MLT student. Notwithstanding Steshenko's interpretation of decontextualized language from the District's contracts with the affiliates, we see nothing in the operative language of the Natividad contract in the record—which Steshenko characterizes as representative—that empowers the District to *compel* an affiliate to accept an MLT student into their laboratory facilities and patient care, despite that affiliate's objection, however ill-considered or invidious the true reason for the objection might be. To be sure, the District could treat a clinical affiliate's alleged discrimination as a violation of the contract's nondiscrimination clause, but Steshenko does not explain how the District would have been entitled to extrajudicial specific performance, as opposed to merely reporting the affiliate to the Civil Rights Department under section 11135 et seq. once it had "reasonable cause to believe" that Steshenko's allegations of age discrimination had merit.[18]

_____

[18] We express no opinion on the adequacy of the District's administrative compliance, where the record does not make clear what action the District took after Ranck advised Steshenko to contact the dean responsible for responding to administrative complaints of discrimination. But we note, as did the *Donovan* court, that the United States Supreme Court in the analogous Title IX context has held that a district's lack of administrative compliance is not privately actionable under the legislative scheme, but

23

We note as well that the record of Steshenko's own conduct—his resistance to performing phlebotomy tasks;[19] his indignation at the lack of compensation; his concurrence with the central aspects of Lee's account of a mutually unsatisfying interview; his initial statement that he would accept a placement in Santa Clara County followed by his refusal to apply for an available placement at Stanford—also gave the District reason to proceed cautiously when Steshenko only later added the claim of age discrimination to his e-mail tally of grievances suffered in his interviews at CHOMP and Natividad. Evidence presented by the District supports its contention that it was Steshenko's uncompromising approach to the interview process that might have created difficulties that he did not or would not fully acknowledge; at the same time, the District had reason to know that Steshenko's approximate age would have been apparent to the clinical affiliates before the affiliates invited Steshenko to interview.

Taken together, the District's evidence is sufficient for the District to meet its burden of showing that it was not deliberately indifferent to Steshenko's stated belief that his rejection by clinical affiliates was due to his age. It escalated his administrative complaint to the relevant dean; it attempted to assist him in marketing himself to interviewers; it continued to forward information on potential placements, however unattractive, until Steshenko expressed that no unpaid placement would be acceptable to him.

Steshenko fails to raise a triable issue of material fact as to deliberate indifference. In his opposing declaration, he states that he "did not agree to donate [his] labor to the

subject to administrative enforcement by the Department of Education. (*Donovan*, *supra*, 167 Cal.App.4th at p. 601.)

[19] As a matter of law, the MLT program was *required* not only to provide practical training in phlebotomy (compare Cal. Code Regs., tit. 17 § 1035.1, subd. (b)(4)(A) with *id.*, § 1035(f)) but to prepare its graduates for eventual employment that could include both phlebotomy and supervision of certified phlebotomy technicians (see Cal. Code Regs., tit. 17, § 1030.6, subd. (b)(2) & (b)(5)).

external corporations in exchange for … permission to enroll into a college course." He complains about the demand placed on him "to perform . . . unpaid service work as a phlebotomist for the benefit of Natividad." Steshenko's indignation at the nature and extent of the clinical requirements as allegedly interpreted by the clinical affiliates—together with his confirmation that phlebotomy was the "breaker" for both the CHOMP and Natividad interviews—could reasonably cause the District to conclude that it was not Steshenko's age that resulted in his rejections for placement in an externship.

### 2. *Breach of Contract*

Steshenko alleged in the sixth cause of action that an implied contract obligated defendants to ensure his "timely graduation from their MLT program in consideration of [Steshenko's] satisfactory performance, payment of the required fees and compliance with the disciplinary requirements." He further alleged: "Any and all legitimate agreements and contracts between defendants and the external entities, which provide their facilities for such courses, are included in the contract between plaintiff and defendants." Defendants argue that any contractual duty fell short of a guarantee that Steshenko would graduate; they further contend that defendants did not breach any contractual duty owed him. We agree with the District, which met its initial burden by presenting evidence that graduation was contingent on completion of MLT program requirements and that there was no contrary implied contract. Steshenko fails to raise a triable issue of material fact regarding the existence of an implied contract of the type he alleged.

"A contract is either express or implied. (Civ. Code, § 1619.) The terms of an express contract are stated in words. (Civ. Code, § 1620.) The existence and terms of an implied contract are manifested by conduct. (Civ. Code, § 1621.) The distinction reflects no difference in legal effect but merely in the mode of manifesting assent. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 102, p. 144.) Accordingly, a contract implied in fact 'consists of obligations arising from a mutual agreement and intent to

25

promise where the agreement and promise have not been expressed in words.' " (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178.)

We agree that, generally speaking, "[t]he basic legal relation between a student and a private university or college is contractual in nature." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 10 (*Zumbrun*).) It has therefore been held that in certain circumstances a contract could exist that obligates a private university to deliver the anticipated number of lectures and normal type of final examination in consideration of the tuition and fees for a course paid by the plaintiff. (*Id.* at pp. 10-11.)

As we have discussed at II.A.1.a., *ante*, however, the District's evidence of the parties' conduct established there were no guarantees as to the availability of clinical placements with third parties or the timing of those opportunities. Nor could their conduct establish obligations exceeding what is described in the student handbook. The language of the student handbook makes clear that placement with a clinical affiliate was not guaranteed, that students needed to interview, and that the selection of students for clinical training would be made by the clinics themselves. The handbook also provided that students who are unable to secure clinical training within two years would no longer be eligible to compete for placement. Buchner sent a welcome e-mail in which she told students that the handbook "explains the program and the externship," and that "there is an interview process for the externship so I highly recommend that you get your resume and interview skills in order," thereby reinforcing the statements in the handbook regarding the externship requirement. This evidence shows the District's expectation that students complete an externship as a requirement for graduation from the program.

Steshenko presented no contrary evidence of conduct by the parties from which any implied contract would arise or run counter to the expectations demonstrated by the District's evidence. Indeed, in his appellate briefing, he disclaims the implied contract theory and asserts that his sixth cause of action is "*not* for breach of an implied contract"

and that "*the implied contract theories . . . are fully irrelevant* to the instant case in view of the lately discovered evidence of respondents' obligations under the operation of law and their express contract with appellant." (Italics added.)

In his opening brief, Steshenko would have us rely on the college catalog as defining the legal and contractual obligations of the parties, but he identifies nothing in the catalog or the record that would suggest that the District ever implied an offer to provide the state-mandated clinical experience other than in a clinical laboratory, or to guarantee a particular location for that clinical experience. Moreover, because he has alleged in the operative pleading only an implied contract, the express terms of the college catalog are not relevant to whether or not he can maintain this cause of action.[20] (*FPI Development*, *supra*, 231 Cal.App.3d at p. 381 [the pleadings delimit the scope of the issues in a motion for summary judgment].) Instead, the District's obligations under an implied contract theory must arise from evidence of the parties' conduct. Notwithstanding the existence of a general contractual relationship between Steshenko and the District, nothing in Steshenko's allegations would, if true, establish that defendants were obligated to ensure his timely graduation despite his objections to the clinical practice requirement.

We note that although Steshenko asserts the contracts between the District and the clinical laboratories were included in the contract between him and defendants, he does not elaborate. He states the external contracts were established for the benefit of the students as intended beneficiaries but provides no reasoned argument or citation to authority for this point. "When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited." (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.) And the one such contract

---

[20] Likewise, plaintiff's contention that defendants breached their contracts with their clinical affiliates is not part of the cause of action and is not relevant.

27

he has attached in support of the complaint expressly provides: "This Agreement is not intended to, and shall not be construed to, create rights or benefits of any kind or type in any third parties such as those students who participate in the clinical experience program except and unless specifically set forth herein." Moreover, the only contract actually addressed in his breach of contract cause of action is the alleged implied contract between him and defendants.[21]

*Chevlin v. Los Angeles Community College Dist.* (1989) 212 Cal.App.3d 382 (*Chevlin*) is instructive. In *Chevlin*, the plaintiff was a student in a nuclear medicine technology program at Los Angeles City College. (*Id.* at p. 386.) Graduates of the two-year program were eligible to sit for a national registry exam required for employment in the field, but were first required to complete the final course in the program: a one-year, paid internship in the nuclear medicine department of a local hospital. (*Ibid.*)

Although the plaintiff in *Chevlin* was able to begin her clinical studies at the hospital, she was eventually moved to a different medical center, and then terminated from both the internship and the program. (*Chevlin*, *supra*, 212 Cal.App.3d at p. 387.) In her lawsuit, the plaintiff sought money damages for breach of contract, negligence, fraudulent concealment, inducing breach of contract, interference with prospective business advantage, and violation of federal civil rights. (*Id.* at p. 388.)

The *Chevlin* court stated that "the law refuses to hold a public school system liable to a student who claims he was inadequately educated" and that, "[w]hether framed as a negligence or breach of contract theory the harm which [the plaintiff sought] to redress [was] the same." (*Chevlin*, *supra*, 212 Cal.App.3d at pp. 389-390.) It distinguished *Zumbrun*, *supra*, 25 Cal.App.3d 1, which "involved a private university, and the plaintiff there was only permitted to seek recovery for tuition and other fees," as opposed to the

_____

[21] Plaintiff states that he attempted to amend the complaint, but his request was denied. His motion to amend the complaint is not before us on appeal.

plaintiff in *Chevlin*, who sought to recover damages for her inability to find employment as a nuclear medicine technologist. (*Chevlin*, *supra*, at p. 390.)

Steshenko's claim for breach of contract closely resembles that discussed in *Chevlin*, *supra*, 212 Cal.App.3d 382. Similar to the plaintiff in *Chevlin*, Steshenko seeks to recover for his inability to obtain required clinical experience to graduate from his school program, and his inability to enter the job market.

We conclude that the District has met its initial burden by presenting evidence that no implied contract existed, and Steshenko fails to provide evidence sufficient to raise a triable issue of material fact in this regard.[22]

### 3. *Intentional Infliction of Emotional Distress*

The elements of a cause of action for intentional infliction of emotional distress are: " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct . . . . " Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) "In evaluating whether the defendant's conduct was outrageous, it is 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been

---

[22] Even if we were to conclude an implied contract existed under which the District was obligated to assure Steshenko's graduation from the program, there is evidence that the District offered to help Steshenko with the interview process and provide other opportunities to apply for an externship, but he refused the offers and declined to continue interviewing at any additional clinical laboratories after his third interview. We therefore would conclude that the District met its initial burden to show it did not breach its obligation under the purported implied contract and that Steshenko has failed to raise a triable issue of material fact as to the alleged breach.

characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496.)

Steshenko does not specify in his operative complaint what conduct forms the basis for this cause of action, alleging only that the "foregoing conduct of defendants is extreme and outrageous." In their briefs, however, the parties agree on the conduct at issue—the denial of enrollment in the clinical practicum courses requiring acceptance into a clinical affiliate's laboratory, and the resulting denial of graduation. What they dispute is whether defendants acted in an extreme and outrageous manner and, for our purposes, whether defendants have met their burden of negating that element of Steshenko's claim.

As we have discussed, the District presented evidence that acceptance by a clinical affiliate was a precondition to the clinical practicum, that completion of the practicum courses was in turn a requirement of the MLT program, and that students were informed of these requirements both by the student handbook and by Buchner. The District also presented evidence of its offers to help Steshenko navigate the selection process and to identify alternative clinical placements. The District met its initial burden with this evidence because it demonstrates that denial of graduation was an expected consequence (i.e., neither extreme nor outrageous) of a student's failure to complete the required clinical practicum courses, which depended on acceptance into a clinical placement with an affiliate. The evidence also shows that the District tried to mitigate Steshenko's difficulties with the clinical selection process, not that it denied his requests with the intent of causing any distress, severe or otherwise.

Steshenko alleged that defendants denied him enrollment in the practicum courses due to his age but, as we concluded in connection with the age discrimination cause of

30

action, the District neither directly discriminated against Steshenko (through the clinical affiliates) nor acted with deliberate indifference to his claims against the clinical affiliates. Steshenko has not provided evidence that would raise a triable issue of material fact as to these issues. Even assuming the District could have done more to intercede on Steshenko's behalf with his preferred clinical affiliates, we are unable to conclude that any inadequacy in its efforts was extreme or outrageous.

Steshenko contends defendants' conduct was outrageous because they knew that he was undergoing professional retraining after a protracted period of unemployment and his ability to make a living depended on completion of that training; he argues, therefore, that their denial of "his graduation, his professional license and his ability to make [a] living" in addition to "the baseless and nonsensical allegation that [plaintiff's] job interviewing skills are deficient" was "extreme and outrageous conduct."

In *Ankeny v. Lockheed Missiles and Space Co.* (1979) 88 Cal.App.3d 531, 534 (*Ankeny*), the plaintiff's employer allegedly deprived him of stewardship in his union and transferred him from one job to another; he was also subject to "personal verbal insults" by his fellow workers; he was passed over for promotion, assigned to work tasks not appropriate to his labor grade, and ultimately terminated. The *Ankeny* court concluded these allegations were insufficient to show outrageous conduct on the part of the defendants. (*Id*. at p. 536.)

Steshenko's claims as to the defendants' conduct—particularly given our conclusions as to his other causes of action—are no more extreme or outrageous than those experienced by the plaintiff in *Ankeny*, *supra*, 88 Cal.App.3d 531. To be sure, defendants did not relieve him of the hardship he claims as a result of age discrimination he alleged three clinical affiliates subjected him to. But under the terms of the state regulatory scheme for approving MLT programs, defendants had no legal authority to waive the requirement of practical training; defendants had no obligation under any agreement with Steshenko to ensure that his clinical opportunities were convenient to his

31

residence or to otherwise guarantee him placement with his preferred choice among the District's identified clinical affiliates. Under the terms of the District's contract with the clinical affiliates, defendants had no authority to override a clinical affiliate's veto of a particular student. Accordingly, even if defendants could be found to have engaged in wrongdoing, the conduct Steshenko complains of does not rise to the level of "extreme and outrageous."[23]

## B. *Plaintiff's Motion for a New Trial*

"Because resolution of a summary judgment motion involves the trial of an issue of law, a decision granting a motion for summary judgment may be challenged by a motion for new trial." (*Scott v. Farrar* (1983) 139 Cal.App.3d 462, 467.) In moving for a new trial, Steshenko invoked all seven potential grounds for such a motion as set forth in Code of Civil Procedure section 657. In his memorandum of points and authorities, however, he argued only that the trial court made errors and that defendants' motion for summary judgment was "granted without any valid factual or legal basis."[24] On appeal, he only contends that defendants' opposition to the motion was untimely and should not have been considered and that the trial court's decision is not supported by the law or any evidence.

At bottom, Steshenko's motion for a new trial sought reconsideration of the order granting summary judgment, on the sole ground that summary judgment remained as wrong as Steshenko had originally argued. The arguments are encompassed by the appeal of the order on the motion for summary judgment, which we have concluded

---

[23] Defendants' alleged breach of contract regardless could not support a cause of action for intentional infliction of emotional distress. (See *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [imposing a general rule precluding tort recovery for noninsurance contract breach in the absence of a violation of an independent duty arising from principles of tort law].)

[24] Plaintiff also claimed the trial judge was biased and should be reassigned. This is not a ground for a new trial.

should be affirmed.  We therefore discern no abuse of discretion in the trial court's denial of the new trial motion.

## III.    DISPOSITION

The trial court's orders are affirmed.  Costs on appeal are awarded to defendants.

_____
LIE, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*Steshenko v. Foothill-DeAnza Community College*
H049871